

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 4, 2019**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| STEPHEN C. JENKINS | § | Case No. 17-42482-ELM-7 |
| *aka* Steve Jenkins and *fdba* Steve Jenkins | § | |
| Construction Co., 3 Point Construction LLC | § | Chapter 7 |
| and Steve Jenkins Remodeling, | § | |
| | § | |
|     Debtor. | § | |
| | § | |
| JAMES DARE and MARY DARE, | § | |
| | § | |
|     Plaintiffs, | § | |
| v. | § | Adversary No. 18-04066 |
| | § | |
| STEPHEN C. JENKINS, | § | |
| | § | |
|     Defendant. | § | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

On January 31, 2019, the above-captioned adversary proceeding came on for trial before

the Court.  Pursuant to the *Original Complaint to Determine Dischargeability of Debt Pursuant to*

*11 U.S.C. § 523*[1] filed by Plaintiffs James Dare and Mary Dare (collectively, the "**Dares**"), the Dares seek a determination that the debt owed to them by Defendant Stephen C. Jenkins ("**Jenkins**"), the Chapter 7 debtor in Case No. 17-42482 (the "**Bankruptcy Case**"), pursuant to a *Final Default Judgment* entered by the 153rd District Court of Tarrant County, Texas in Cause No. 153-286874-16 (the "**Prepetition Judgment**")[2] is nondischargeable pursuant to Section 523(a)(2)(A) of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"). Specifically, alleging that Jenkins made false disclosures with respect to the existence of an on-site aerobic sewage treatment system (an "**Aerobic Sewer System**") on real property located at 6299 Bennett Lawson Road in Mansfield, Texas (the "**Bennett Lawson Property**") in connection with the sale of such property to them, and that the Prepetition Judgment was obtained against Jenkins on account of such false disclosures, the Dares allege that the debt owed pursuant to the Prepetition Judgment constitutes debt for money obtained from the Dares by false pretenses, a false representation and/or actual fraud and is therefore nondischargeable.[3] Pursuant to *Defendant's First Amended Original Answer*,[4] Jenkins denies the existence of any such false pretenses, false representation or actual fraud.

---

[1] Docket No. 1 (the "**Complaint**").

[2] *See* Docket No. 6-1, at pp.5-6 (certified copy of Prepetition Judgment, of which the Court takes judicial notice).

[3] Pursuant to the Complaint, the Dares also assert a right to the recovery of reasonable attorneys' fees in bringing the adversary proceeding. *See* Complaint, at p.5 (prayer for relief). If and to the extent the Dares continue to assert that there is a legal basis for the recovery of attorneys' fees in this case, such relief must be pursued separately in accordance with the provisions of Fed. R. Civ. P. 54(d)(2), as made applicable to this action pursuant to Fed. R. Bankr. P. 7054(d)(2).

[4] Docket No. 5 (the "**Answer**").

Having considered the Complaint, the Answer, the parties' proposed *Joint Final Pre-Trial Order*,[5] the Dares' *Proposed Findings of Fact and Conclusions of Law*,[6] *Defendant's Proposed Findings of Fact and Conclusions of Law*,[7] and the parties' respective post-trial briefing,[8] the Court now issues its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[9]

## JURISDICTION

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc (Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas. Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). Pursuant to 28 U.S.C. § 157(b)(1), the Court has the statutory authority to enter a final judgment in this proceeding, and based upon the bankruptcy-specific nature of the cause of action at issue, there are no *Stern*-based Constitutional limitations[10] to the Court entering a final judgment.

---

[5] Docket No. 23 (the "**Proposed PTO**"). The Court declined to enter the Proposed PTO due to the number of errors contained within the document. *See, e.g.*, Proposed PTO, at p2. (erroneously referring to "Bankruptcy Code § 548(a)(2)(A)" as the statutory basis for the action, and erroneously referring to 28 U.S.C. § 1391 as the statutory basis for venue of the action).

[6] Docket No. 22 ("**Plaintiffs' Proposed Fs & Cs**").

[7] Docket No. 20 ("**Defendant's Proposed Fs & Cs**").

[8] *See* Docket Nos. 24 and 25.

[9] To the extent any of the following Findings of Fact are more appropriately categorized as Conclusions of Law or include any conclusions of law, they should be deemed as Conclusions of Law, and to the extent that any of the following Conclusions of Law are more appropriately categorized as Findings of Fact or include any findings of fact, they should be deemed as Findings of Fact.

[10] *See Stern v. Marshall*, 131 S. Ct. 2594 (2011).

### *FINDINGS OF FACT*

1. Jenkins filed for relief under Chapter 7 of the Bankruptcy Code on June 13, 2017.

2. Prior to the filing, Jenkins had been in the home remodeling and construction business for roughly 15 to 20 years, during which time he remodeled and sold several hundred homes.

#### A. *The Jenkinses Acquire the Bennett Lawson Property*

3. Jenkins and his wife Elizabeth Jenkins (collectively, the "**Jenkinses**") purchased the Bennett Lawson Property in 2001, at which time the property had an on-site conventional anaerobic septic tank sewer system (a "**Septic Tank Sewer System**"). Prior to purchasing the Bennett Lawson Property, Jenkins had never owned a home with an on-site sewer facility.

4. Despite their lack of knowledge about on-site sewer systems,[11] the Jenkinses testified that they decided to upgrade the Septic Tank Sewer System to an Aerobic Sewer System in or about 2007. According to Jenkins, he hired Peter Gross to undertake the conversion project based upon a referral and recommendation obtained from one of his regular subcontractors. Once hired, Mr. Gross allegedly lined up a separate licensed plumber/journeyman to undertake the actual work. Jenkins allegedly never learned the name of this separate licensed plumber/journeyman.

5. According to the Jenkinses, the Aerobic Sewer System was, in fact, installed and they never had any problems with it during the remaining period of their ownership of the Bennett Lawson Property.

---

[11] There are distinct differences between a conventional Septic Tank Sewer System and an Aerobic Sewer System. In the case of a Septic Tank Sewer System, the septic tank fills up with both liquids and solids. Once the liquids within the tank reach a certain level, the liquids leach out into what is commonly referred to as a leach field. Periodically, the solids must be pumped out of the tank. While an Aerobic Sewer System is similar, the liquid and solid waste goes through a secondary aerobic treatment and disinfection phase which then allows for the treated liquid to be periodically sprinkled out onto the property by sprinklers. Importantly, an Aerobic Sewer System is dependent upon electricity to supply the air required for aerobic treatment of the waste. *See* www.tceq.texas.gov/assistance/water/fyiossfs.html (basic information on septic systems provided by Texas Commission on Environmental Quality).

**B.** *Sale of the Bennett Lawson Property and Disclosures in Connection Therewith*

6.      In 2015, the Jenkinses decided to sell the Bennett Lawson Property, entering into a contract for sale with the Dares in September 2015 (including amendments thereto, the "**Earnest Money Contract**").[12]

7.      In connection with execution of the Earnest Money Contract, the Jenkinses provided the "Seller's Disclosure Notice" required by Section 5.008 of the Texas Property Code,[13] pursuant to which they disclosed to the Dares, among other things, that the Bennett Lawson Property had a septic or other on-site sewer system that was in working condition.[14]  In connection therewith, Jenkins separately also provided a signed "Information About On-Site Sewer Facility" disclosure, dated September 11, 2015 (the "**Sewer System Disclosure**"),[15] pursuant to which Jenkins disclosed information to the Dares regarding the sewer facility servicing the Bennett Lawson Property.  In particular, Jenkins represented that the type of sewer facility servicing the property was an "Aerobic Treatment" system; that the Aerobic Sewer System had a two-sprinkler distribution system; that Peter Gross Plumbing & Septic had installed the system; and that the system was approximately 8 years old.[16]

8.      Jenkins acknowledged that the Sewer System Disclosure was a document that he had to prepare and include information on in order to sell the Bennett Lawson Property.

9.      Through counsel at trial, however, Jenkins also highlighted the fact that, under the terms of the Earnest Money Contract, the Dares agreed to accept the Bennett Lawson Property "As

---

[12] *See* Plaintiffs' Exh. 1 (Bates range DARE0008 to DARE0018) (Earnest Money Contract).

[13] *See id.* (Bates range DARE0019 to DARE0026).

[14] *Id.* (Bates page DARE0021).

[15] *See* Plaintiffs' Exh. 2 (Sewer System Disclosure).

[16] *Id.*, at p.1 (¶ A).

Is," meaning in the "present condition of the Property with any and all defects and without warranty except for the warranties of title and the warranties in this contract."[17]  Pursuant to the contract, the Dares' "agreement to accept the Property As Is … [did] not preclude [the Dares] from inspecting the Property under Paragraph 7A, from negotiating repairs or treatments in a subsequent amendment, or from terminating [the] contract during the Option Period, if any."[18]  Page 2 of the Sewer System Disclosure included the following additional cautionary statement: "This document is not a substitute for any inspections or warranties.  This document was completed to the best of Seller's knowledge and belief on the date signed.  Seller and real estate agents are not experts about on-site sewer facilities.  Buyer is encouraged to have the on-site sewer facility inspected by an inspector of Buyer's choice."[19]

10.     That said, in filling out the Sewer Facility Disclosure, Jenkins acknowledged that he understood that the Sewer Facility Disclosure was going to be transmitted to the Dares, that it set forth a representation as to the existence of an Aerobic Sewer System on the Bennett Lawson Property, and that the Dares would be relying upon the information.  In fact, Jenkins admitted that it was his intention that the Dares rely upon the information disclosed within the Sewer Facility Disclosure.

11.     While the Dares obtained an inspection of the Bennett Lawson Property prior to closing, the inspection did not include an inspection of the sewer facility.  And ultimately no pre-closing negotiations took place with respect to the installation, replacement or repair of the Aerobic

---

[17] *See* Earnest Money Contract, ¶ 7.D.

[18] *Id*.  Under the terms of the Earnest Money Contract, the Option Period was 20 days after the effective date of the contract.  *Id*., ¶ 23.

[19] Sewer System Disclosure, at p.2.

Sewer System represented to be in place on the property, nor did the Dares exercise the option to terminate the contract prior to closing.

12.     In October 2015, the sale of the Bennett Lawson Property to the Dares closed.

**C.     *The Dares Discover the Lack of a Properly Installed, Functioning Aerobic Sewer System***

13.     On December 31, 2015, within just over two months of the closing, the Dares experienced their first major problem with the on-site sewage facility when the toilets would not flush and sewage began to back up into the house.  At that point in time the extent of the deficiency with the system was unknown, being diagnosed by the Dares' hired plumber as nothing more than a blockage problem, and the immediate issue was temporarily fixed by the plumber. Approximately 3 months later, however, in March 2016, the Dares began to experience the same problem.  This time, their hired plumber discovered that the problem was not just blockage, but rather the lack of a properly installed and functioning Aerobic Sewer System.

14.     In this regard, the plumber discovered, among other things, that the aerobic system controller box purportedly regulating operation of the Aerobic Sewer System was not even connected to a power source.  Specifically, the plumber discovered that there were no wires connecting the leads inside the controller box to an electrical source on the property.

15.     Ultimately it was determined that the sewer system servicing the property was, in reality, the original Septic Tank Sewer System modified *to appear* as though it were an Aerobic Sewer System (*e.g.,* by adding the controller box and a couple of sprinkler heads).  Clearly, it was not a fully installed, functioning Aerobic Sewer System.

16.     Upon learning of these deficiencies, the Dares sought to contact the contractor purportedly responsible for installing the Aerobic Sewer System.  Mrs. Dare first attempted to obtain contact information for the contractor from Jenkins, but Jenkins was evasive in responding

and ultimately did not provide the requested information.[20]   Therefore, based upon the listing of Peter Gross on the Sewer System Disclosure as the installer of the Aerobic Sewer System, the Dares attempted to locate Mr. Gross through a public records search.  They were unsuccessful, finding no listing for a Peter Gross with the Texas licensing board of plumbers or with the Texas Commission on Environmental Quality.  In fact, based upon their research, the Dares discovered that there was no such Peter Gross ever licensed within the State of Texas during the relevant time period.

17.    In connection with these research efforts, Mr. Dare also learned that an Aerobic Sewer System is required to be permitted and registered with the county in which the real property is situated.  Thus, using the serial number that he found on the controller box, he attempted to look up the registration, believing that it might lead to information about the actual plumber/journeyman who purportedly installed the system.  To his surprise, he discovered that the controller box was not even registered to the Bennett Lawson Property, but rather to a trailer home located elsewhere within the county.  Moreover, he discovered that no permit for an Aerobic Sewer System had ever been obtained for the Bennett Lawson Property.

18.    The Dares testified that they relied upon the Sewer Facility Disclosure in moving forward with the closing on the Bennett Lawson Property and that, had they known that the Sewer System Disclosure was false and that the property did not have an actual, functioning Aerobic Sewer System, they would either have required the Jenkinses to fully install an Aerobic Sewer System as a condition to closing or exercised their option to back out of the purchase of the property.

---

[20] *See, e.g.*, Plaintiffs' Exh. 3.

19.     Jenkins, on the other hand, testified that the property had a fully functioning Aerobic Sewer System as of the time of the sale, and that he had never had any problems with it. In response to testimony about the deficiencies discovered, Jenkins further testified that prior to the sale of the Bennett Lawson Property he had never sold a property with an on-site sewer facility, and that based upon his lack of familiarity with the differences between a Septic Tank Sewer System and an Aerobic Sewer System, at no point in time prior to the sale of the Bennett Lawson Property to the Dares did he become aware of the fact that a fully functioning Aerobic Sewer System had never been installed on the property.

20.     The Court found the Dares' testimony, including with respect to their reliance on the Aerobic Sewer System disclosures in moving forward with purchase of the Bennett Lawson Property and their inducement to close based upon such disclosures, to be credible. The Court did not find Jenkins' testimony to be credible. Among other things, given the extensive experience of Jenkins in the home remodeling business, while he may not have had any prior experience with septic systems, he certainly would have known to (1) independently inspect, or had someone on his behalf inspect, any upgraded Aerobic Septic System on the property upon completion to ensure that the system was operating and that, among other things, the controller box had power and was functioning, and (2) ensured that the upgraded Aerobic Septic System was properly registered and permitted. Moreover, Jenkins' evasive correspondence to Mrs. Dare in response to her request for contact information for the installer, and even more troubling the later discovery of the non-existence of any licensed plumber named Peter Gross in Texas, contrary to Jenkins' representations in the Sewer System Disclosure, is further evidence of Jenkins' lack of credibility.

21.     Thus, based upon the evidence presented and the demeanor of the witnesses, the Court finds that Jenkins knowingly misrepresented the existence of an Aerobic Septic System on

the Bennett Lawson Property to the Dares in connection with selling the property to them, that Jenkins misrepresented such information with the intent of causing the Dares to rely on such information and in an effort to induce the Dares to purchase the property, and that the Dares in fact relied upon such information in purchasing the property and were induced into purchasing the property.

**D.** **The Dares Install an Actual, Functioning Aerobic Sewer System, Pursue Litigation Against Jenkins, and Obtain the Prepetition Judgment**

22.     Ultimately, the Dares were forced to replace the existing sewer system with an actual Aerobic Sewer System.  The replacement Aerobic Sewer System had all of the features of a properly installed and functioning Aerobic Sewer System, including a large vault with three separate chambers, a controller that operates the system, and five different irrigation heads; it was inspected and permitted; and it otherwise satisfied all of the requirements of the county.  The total cost of addressing and replacing the deficient sewer system was $17,486.72.[21]

23.     On August 5, 2016, the Dares initiated litigation in the 153rd District Court of Tarrant County, Texas (the "**State Court**"), under Cause No. 153-286874-16, to assert the following causes of action against Jenkins based upon the Aerobic Sewer System misrepresentations/non-disclosures: actual fraud by misrepresentation; actual fraud by non-disclosure; statutory fraud; and negligent misrepresentation.[22]  Jenkins did not file an answer or otherwise respond or appear in the case.[23]  Consequently, the Dares moved for entry of a default judgment.

---

[21] *See* Plaintiffs' Exhs. 4, 5 and 6.

[22] *See* Docket No. 6-1, at pp.8-12 (certified copy of the Dares' Original Petition in the State Court action (the "**State Court Petition**"), of which the Court takes judicial notice.  The causes of action are asserted within ¶¶ 6.01-6.05).

[23] *See* Prepetition Judgment, at p.1 (finding, among other things, that "Defendant [Jenkins], having been duly served with citation and a copy of Plaintiffs' Petition, did not appear and answer.")

24. On December 16, 2016, following an evidentiary hearing, the Dares obtained entry of the Prepetition Judgment. Pursuant to the Prepetition Judgment, the Dares were awarded the following amounts against Jenkins (collectively, the "**Judgment Debt**"): (a) $17,486.72 in actual damages; (b) prejudgment interest of $324.74; (c) court costs in an unspecified amount; and (d) post-judgment interest on all of the foregoing amounts at the rate of 5.0%, compounded annually, until paid in full.[24]

25. The Prepetition Judgment does not contain any findings of fact with respect to any of the factual allegations made against Jenkins in the State Court Petition. The Prepetition Judgment also does not identify the specific cause(s) of action upon which the judgment is predicated.[25]

## CONCLUSIONS OF LAW

### A.    *Nondischargeability Under Section 523(a)(2)(A) of the Bankruptcy Code*

Section 523(a)(2)(A) of the Bankruptcy Code provides that a bankruptcy discharge obtained by an individual debtor does not discharge the debtor from any debt for money[26] to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's and an insider's financial condition."[27] The Dares have the burden of proving nondischargeability under Section 523(a)(2)(A) by a preponderance of the evidence.[28]

---

[24] Complaint, ¶ 9; Answer, ¶ 9; *see also* Prepetition Judgment.

[25] *See* Prepetition Judgment.

[26] For purposes of Section 523(a)(2)(A), the debt may also be for "property, services, or an extension, renewal, or refinancing of credit." 11 U.S.C. § 523(a)(2). In this case, however, because the debt at issue is for money, the discussion of Section 523(a)(2)(A) herein is limited to money.

[27] *See* 11 U.S.C. § 523(a)(2)(A) ("A discharge under section 727 … of this title does not discharge an individual debtor from any debt … (2) for money … to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition").

[28] *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th Cir. 2018); *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001).

The operative terms "false pretenses," "false representation" and "actual fraud" have been described by the Supreme Court as "carry[ing] the acquired meaning of terms of art. They are common-law terms, and … imply elements that the common law has defined them to include."[29] With that in mind, prior to the Supreme Court's recent issuance of the *Husky* opinion,[30] many courts had construed the three categories of fraudulent conduct (*i.e.* false pretenses, a false representation and actual fraud) as collectively referring to common law fraud, thereby requiring proof of, among other things, a fraudulent representation and reliance thereon by the plaintiff.[31] In *Husky*, however, the Supreme Court explained that "actual fraud," having been added by Congress as an additional basis for nondischargeability under the newly-enacted Bankruptcy Code in 1978, encompasses conduct that goes beyond fraud by misrepresentation.[32] Among other things, "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."[33] Thus, in light of the clarification provided in *Husky*, it is important to consider each of the three categories of fraudulent conduct alleged by the Dares under Section 523(a)(2)(A).

First, in the case of "false pretenses," under Texas common law the term "false pretense" has historically been utilized in the criminal law context to refer to a fraudulent misrepresentation, whether actual or implied by action, made for the purpose of inducing another to part with money

---

[29] *Field v. Mans*, 516 U.S. 59, 69 (1995).

[30] *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581 (2016).

[31] *See, e.g.*, *General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (requiring proof of common law fraud elements to establish nondischargeability under § 523(a)(2)(A)).

[32] *Husky Int'l Elecs., Inc.*, 136 S. Ct. at 1586 (Based upon Congress' addition of "actual fraud" to "false pretenses" and a "false representation" as a basis for nondischargeability, "[i]t is therefore sensible to start with the presumption that Congress did not intend 'actual fraud' to mean the same thing as 'a false representation,'….").

[33] *Id.*

or property.[34] Thus, to establish "false pretenses" for nondischargeability purposes under Section 523(a)(2)(A) (as well as "actual fraud," to the extent that false pretenses constitute a form of actual fraud), a creditor must prove: (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the debtor made the representation for the purpose of inducing the creditor to part with money or property; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor parted with money or property as a proximate result.

Turning next to the alternative ground of "false representation" (as well as "actual fraud," to the extent that a false representation constitutes a form of actual fraud), relying upon applicable elements of common law fraud under Texas law, courts have required proof of the following by a creditor in order to establish a "false representation" for nondischargeability purposes under Section 523(a)(2)(A): (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.[35]

Finally, with respect to other forms of "actual fraud" that may serve as a basis for nondischargeabiltiy under Section 523(a)(2)(A) (*i.e.* other than by false pretenses or a false representation), the Supreme Court has expressly ruled that "actual fraud" does not require a false representation.[36] Instead, it simply requires proof of fraudulent conduct involving moral turpitude

---

[34] *See Blum v. State*, 20 Tex. App. 578, 592-93 (Tex. Ct. App. 1886); *Colbert v. State*, 1 Tex. App. 314, 321 (Tex. Ct. App. 1876); *see also Bomar v. Insurors Indem. & Ins. Co.*, 150 Tex. 484, 486 (Tex. 1951) (discussing term as "false pretext"); *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 383-84 & nn.239-40 (Bankr. N.D. Tex. 2017) (distilling meaning of "false pretenses" based upon review of other opinions in which meaning considered).

[35] *See Saenz*, 899 F.3d at 394 (citing *Mercer*, 246 F.3d at 403); *Acosta*, 406 F.3d at 372.

[36] *Husky Int'l Elecs., Inc.*, 136 S. Ct. at 1588 ("[A] false representation has never been a required element of 'actual fraud,' and we decline to adopt it as one today"); *see also id.* at 1590 (finding that a fraudulent conveyance scheme may constitute a form of "actual fraud" for purposes of 11 U.S.C. § 523(a)(2)(A)).

or for the purpose of committing an intentional wrong. As explained by the Supreme Court in *Husky*:[37]

> "Actual fraud" has two parts: actual and fraud. The word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."
>
> Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely….There is no need to adopt a definition for all times and all circumstances….

Thus, to establish "actual fraud" other than by false pretenses or a false representation for nondischargeablity purposes under Section 523(a)(2)(A), a creditor must prove: (1) the debtor engaged in fraudulent conduct; (2) the debtor undertook such action with wrongful intent;[38] and (3) the creditor sustained a loss as a proximate result.

## B.     *The Prepetition Judgment and Assertions of Res Judicata and Collateral Estoppel*

With the foregoing parameters in mind, both the Dares and Jenkins claim that the outcome of this action is controlled by the Prepetition Judgment. First, the Dares assert that they are entitled to judgment in their favor based upon collateral estoppel, arguing that the Prepetition Judgment is predicated upon a conclusive determination by the State Court that Jenkins engaged in the type of fraudulent conduct covered by Section 523(a)(2)(A) of the Bankruptcy Code. While the Dares'

---

[37] *Id.* at 1586-87 (citations omitted) (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1877)).

[38] Based upon their interpretation of *Husky*, the Dares assert that "actual fraud" does not require any *wrongful* intent on the part of the debtor. *See* Docket No. 25, at p.2 ("Here, the United States Supreme Court has made clear that … actual *intentional, knowing* fraud to a creditor is not required under section 523(a)(2)(A)") (emphasis added). Instead, they argue that "actual fraud" may be established even in those instances where a debtor *unknowingly* makes a false representation to a creditor, provided the debtor has intentionally made such representation for the purpose of inducing action on the part of the creditor. *See id.* (arguing that statutory real estate fraud under Tex. Bus. & Com. Code § 27.01(a)(1) does not require wrongful intent and is a form of actual fraud for purposes of section 523(a)(2)(A)). The Court disagrees. The Dares overlook the Supreme Court's analysis of the meaning of "actual" in construing "actual fraud" and the Court's distinction between "actual" fraud and "implied" fraud or fraud "in law." *See Husky Int'l Elecs., Inc.*, 136 S. Ct. at 1586.

request for summary judgment on this basis was previously denied by the Court,[39] the Dares request reconsideration based upon the additional evidence introduced at trial. Jenkins, on the other hand, having timely raised the affirmative defenses of *res judicata* and collateral estoppel in his Answer, asserts that any alleged fraudulent conduct on his part was fully and finally litigated in the State Court action, that the State Court neither expressly found that he engaged in any such fraudulent conduct nor expressly rendered judgment on any of the Dares' fraud-based claims, and that the Dares are now barred from further litigating or relitigating the fraud-based issues in connection with this case.[40] Both the Dares and Jenkins are incorrect.

When considering the preclusive effect of a state court judgment, a federal court is to apply the preclusive rules of the state in which the judgment was rendered.[41] Thus, because the Prepetition Judgment was issued by a Texas state court, the elements of *res judicata* and collateral estoppel must be considered under Texas law.

To establish *res judicata* under Texas law, the proponent of *res judicata* must prove the following: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) an identity of the parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action.[42] Here, Jenkins, the proponent of *res judicata*, cannot establish the third element as a matter of law. Not only was the current nondischargeability claim under Section 523 of the Bankruptcy Code not asserted in the State Court action, but it could not have been asserted or determined in such action because the

---

[39] *See* Docket Nos. 6, 7 and docket entry of July 23, 2018 (The Honorable Russell F. Nelms presiding).

[40] *See* Answer, ¶¶ 17-19; Proposed PTO, § D.2. (setting out Jenkins' contentions);

[41] *Raspanti v. Keaty (In re Keaty)*, 397 F.3d 264, 270 (5th Cir. 2005); *see also* 28 U.S.C. § 1738 (full faith and credit statute).

[42] *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *see also Cox v. Nueces County, Texas*, 839 F.3d 418, 421 (5th Cir. 2016).

Bankruptcy Case had not yet been initiated and a nondischargeability claim under Section 523 has no existence outside of the bankruptcy context.  "To be sure, '[t]he ultimate finding of whether [a debt is nondischargeable, as "defined" by the bankruptcy law] is solely [in] the province of the bankruptcy court.'"[43]  "Since 1970, … the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code."[44]  Thus, Jenkins' invocation of the doctrine of *res judicata* in an effort to prevent the Dares' prosecution of their nondischargeability claim in this Court is unavailing.[45]

Turning next to collateral estoppel, under Texas law the proponent of collateral estoppel must establish the following: (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action.[46]  In this case, for the reasons set out below, neither the Dares nor Jenkins can satisfy either of the first two elements.

By its very nature, the first element – "full and fair litigation" of relevant facts – requires *actual* litigation of such facts, and "[a]s a general rule, an issue is 'actually litigated' only when it is properly raised by the pleadings, submitted for a determination, and actually determined."[47] With this in mind, because under Texas law a defendant who fails to answer a state court petition is deemed to have admitted all properly pled factual allegations within the petition with respect to

---

[43] *Dennis v. Dennis (In re Dennis)*, 25 F.3d 274, 278 (5th Cir. 1994) (quoting *In re Shuler*, 722 F.2d 1253, 1256 (5th Cir.), *cert. denied*, 469 U.S. 817 (1984)), *cert. denied*, 513 U.S. 1081 (1995).

[44] *Grogan v. Garner*, 498 U.S. 279, 284 (1991).

[45] *See Pancake v. Reliance Ins. Co. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir. 1997) ("At the outset we note that claim preclusion or *res judicata* is inapplicable in bankruptcy nondischargeability proceedings"); *see also Clem*, 583 B.R. at 339 (explaining that, under Supreme Court precedent, the doctrine of *res judicata* does not apply in bankruptcy dischargeability proceedings) (citing *Brown v. Felsen*, 442 U.S. 127, 133-39 (1979)).

[46] *John G. & Marie Stella Kennedy Memorial Found. v. Dewhurst*, 90 S.W.3d 268, 288 (Tex. 2002); *see also Pancake*, 106 F.3d at 1244.

[47] *Gober v. Terra + Corp. (In re Gober)*, 100 F.3d 1195, 1203 (5th Cir. 1996).

liability,[48] "[c]ourts generally hold that no-answer default judgments fail to meet the 'actually litigated' prong of the issue preclusion test."[49] While this is typically the case in a "no answer" default scenario, the Dares nevertheless correctly argue that, ultimately, the determination of "full and fair litigation" is whether the plaintiff was put to the task of having to actually satisfy the plaintiff's evidentiary burden on the particular issue in question.[50]

Here, the Dares assert that even though Jenkins failed to answer the State Court Petition and the motion for default judgment and did not appear at the hearing on the motion for default judgment,[51] the Prepetition Judgment is nevertheless entitled to collateral estoppel effect because the Dares introduced evidence with respect to liability at the hearing on the motion for default judgment. In other words, issues of fact with respect to liability were fully and fairly litigated at the default judgment hearing. And given the fact that the Prepetition Judgment does not contain any express findings of fact on any of the causes of action asserted by the Dares, the Dares appear to argue that, based upon the evidence presented, the State Court implicitly made factual determinations in their favor on *all* of their causes of action, including the fraud-based claims.

Jenkins takes an alternative approach. Concurring with the Dares' assertion that all relevant issues were actually litigated,[52] Jenkins first argues that, as a result of the full and final litigation of such issues, the Dares are collaterally estopped from further litigating or relitigating any of them in this case. Second, based upon the lack of any express findings of fraud within the Prepetition Judgment and the fact that the determination of liability within the Prepetition

---

[48] *See id.* at 1204 (citing *Stoner v. Thompson*, 578 S.W.2d 679, 682 (Tex. 1979)).

[49] *Gober*, 100 F.3d at 1204.

[50] *See Pancake*, 106 F.3d at 1244-45.

[51] *See* Prepetition Judgment, at p.1 ("Defendant, having been duly served with citation and a copy of Plaintiffs' Petition, did not appear and answer").

[52] *See* Defendant's Proposed Fs & Cs, at p.3 (proposed Conclusions of Law, ¶ 1).

Judgment is not expressly predicated on any of the Dares' fraud-based claims, Jenkins argues that there is no basis upon which this Court may now find the Prepetition Judgment to be nondischargeable under Section 523(a)(2)(A) of the Bankruptcy Code.

In relation to both arguments, while it appears that the Dares did, in fact, introduce some evidence with respect to liability at the default judgment hearing, and that the State Court considered such evidence in granting the request for default judgment,[53] nothing within the Prepetition Judgment reflects how the State Court ruled on, or whether the State Court made a determination at all with respect to, each individual cause of action asserted in the State Court Petition. Thus, given the lack of evidence of how, or whether, any particular issue was "actually determined" by the State Court, both the Dares and Jenkins have failed to establish the first prong of the collateral estoppel test.[54]

But even if the first element were satisfied, the Dares and Jenkins also cannot satisfy the second element of the collateral estoppel test due to the lack of any express findings or determinations within the Prepetition Judgment. In the case of the Dares, for example, because the State Court may have predicated its determination of liability solely on a finding of negligent misrepresentation (one of the causes of action asserted by the Dares in the State Court Petition), and because negligent misrepresentation does not equate to false pretenses, a false representation or actual fraud for purposes of nondischargeability under Section 523(a)(2)(A) of the Bankruptcy

---

[53] *See, e.g.*, Prepetition Judgment, at p.1 ("After considering the pleadings, the papers on file in this case, and the *evidence presented on liability* and damages, the Court grants Plaintiffs' Motion for Default Judgment") (emphasis added).

[54] *Gober*, 100 F.3d at 1203 ("an issue is 'actually litigated' only when it is properly raised by the pleadings, submitted for a determination, *and actually determined*") (emphasis added).

Code,[55] then it cannot be said that a determination of false pretenses, a false representation or actual fraud was "essential to the judgment in the first action [*i.e.* the Prepetition Judgment]." Similarly, in the case of Jenkins, because the State Court may instead have predicated its determination of liability on a finding of actual fraud by misrepresentation or actual fraud by non-disclosure (each sufficient for nondischargeability purposes under Section 523(a)(2)(A)), then it cannot be said that a determination of liability on some other ground (*i.e.* negligent misrepresentation or "unknowing" statutory fraud,[56] neither of which satisfies the level of fraudulent conduct required for nondischargeability under Section 523(a)(2)(A)) was "essential to the judgment in the first action." Accordingly, neither Jenkins nor the Dares are collateral estopped from litigating the issue of whether the Prepetition Judgment constitutes a debt for money obtained by false pretenses, a false representation and/or actual fraud.

### C.    Consideration of the "As Is" Clause in the Earnest Money Contract

Jenkins additionally asserts that the Judgment Debt cannot be determined to be nondischargeable based upon a misrepresentation contained within the Sewer System Disclosure because the "as is" clause of the Earnest Money Contract negates reliance on the part of the Dares. In this regard, for purposes of nondischargeability predicated upon false pretenses or a false representation,[57] proof of the plaintiff's actual and justifiable reliance on the debtor's

---

[55] *See, e.g., Smith v. Meyers (In re Schwartz & Meyers)*, 130 B.R. 416, 422 (Bankr. S.D.N.Y. 1991) ("To be actionable [under 11 U.S.C. § 523(a)(2)(A)], the debtor's conduct must involve moral turpitude or intentional wrong; mere negligence … is insufficient").

[56] As indicated above, the Dares assert that statutory real estate fraud under Tex. Bus. & Com. Code § 27.01(a)(1) does not require proof of wrongful intent on the part of the seller. *See* footnote 38, *supra*. For purposes of the Court's ruling herein, it is unnecessary for the Court to determine whether such assertion is legally correct. Instead, the Court simply takes at face value the Dares' assertion that their State Court statutory fraud count was not predicated on an assertion of wrongful intent on the part of Jenkins.

[57] Reliance is not a required element for forms of "actual fraud" that are not premised on a misrepresentation. *Husky*, 136 S. Ct. at 1590.

misrepresentations is required.[58]  Here, because the Dares agreed to accept the property "as is" in whatever condition the property was in, including the sewer system, Jenkins argues that, as a matter of law, the Dares cannot establish that they relied upon any representations contained within the Sewer System Disclosure.  Jenkins overstates the effect of an "as is" agreement.

While ordinarily an agreement to accept property "as is" will preclude a buyer's later complaint about the condition of the property, an "as is" clause does not immunize fraudulent conduct on the part of a seller.  As explained by the Texas Supreme Court:

> A buyer is not bound by an agreement to purchase something "as is" that he is induced to make because of a fraudulent representation or concealment of information by the seller.  A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase "as is", and then disavow the assurance which procured the "as is" agreement.[59]

Accordingly, the inquiry here is whether the Dares were induced into moving forward with the "as is" purchase based upon Jenkins' fraudulent representation of information concerning the property.

Such inquiry dovetails with the overall inquiry of whether the Dares actually and justifiably relied on Jenkins' misrepresentation of the existence of a fully installed, functioning Aerobic Sewer System.  As to same, the Dares testified that they actually and justifiably relied upon the disclosures set forth within the Sewer System Disclosure in deciding to move forward with the closing and that, had they known that the Sewer System Disclosure was false and that the property did not have an actual, functioning Aerobic Sewer System, they would either have required the Jenkinses to fully install an Aerobic Sewer System as a condition to closing or exercised their option to back out of the purchase of the property.  Jenkins, on the other hand, asserts that any reliance placed by the Dares on the representations set forth within the Sewer System Disclosure

---

[58] *See Mans*, 516 U.S. at 70-75; *Mercer*, 246 F.3d at 403.

[59] *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995); *see also Larsen v. Carlene Langford & Assocs., Inc.*, 41 S.W.3d 245, 251-54 (Tex. App.—Waco 2001, pet. denied).

was not justifiable because the Dares were given the contractual opportunity to inspect the sewer system, which would or could have led to the discovery of any problems, but neglected to undertake any such inspection.

For purposes of evaluating reliance, "justifiable" reliance is to be distinguished from "reasonable" reliance.  Of particular significance, "justifiable" reliance is not dependent upon the plaintiff's conduct having conformed to the standard of a "reasonable man."[60]  In other words, while under a "reasonable" reliance standard there might have existed a duty to obtain an inspection of the on-site sewer facility as part of the normal due diligence process, under a "justifiable" reliance standard no such independent duty is imposed.[61]  Instead, the proper focus is on whether the falsity of the represented facts – here, the existence of a fully installed, functioning Aerobic Sewer System – was patently discoverable by the Dares, thereby causing their reliance on such misrepresented facts to be unjustified.  As illustrated by the Supreme Court in *Field v. Mans*:

> [In order to establish justifiable reliance, a plaintiff is] 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.  Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect.  On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses.  Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.'[62]

In this case, no evidence was introduced to establish that Jenkins' misrepresentation of a fully installed, functioning Aerobic Septic System was patently discoverable by either of the Dares, and

---

[60] *See Mans*, 516 U.S. at 70-71; *see also Colbert*, 1 Tex. App. at 321 (analyzing requirement of inducement for false pretenses under Texas law and determining that "the pretense need not be such an artificial device as will impose upon a man of ordinary prudence or caution; that the pretense need not be such as cannot be guarded against by ordinary caution or common prudence").

[61] *Mans*, 516 U.S. at 77; *Mercer*, 246 F.3d at 422.

[62] *Mans*, 516 U.S. at 71 (quoting Restatement (Second) of Torts (1976) § 541, cmt. a).

the Court finds and determines that the Dares' reliance on the misrepresented existence of an Aerobic Sewer System on the Bennett Lawson Property pursuant to the Sewer System Disclosure was justifiable under the facts and circumstances of this case.

### D.     Nondischargeability of Judgment Debt

Based upon all of the foregoing, the Court finds and concludes that Jenkins represented to the Dares that the Bennett Lawson Property had a fully installed, functioning Aerobic Sewer System, which representation was false; that Jenkins knew the representation was false; that Jenkins made the representation for the purpose of deceiving the Dares and inducing them to part with money in purchasing the property; that the Dares actually and justifiably relied on the representation in purchasing the property; and that, as a proximate result, the Dares parted with money upon the closing and ultimately suffered a loss in the amount of the Judgment Debt. Accordingly, the Court further concludes that the Judgment Debt is a debt of Jenkins for money obtained by false pretenses, by a false representation, and by actual fraud, in each case which is nondischargeable pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.  The Court will separately issue a Judgment in conformity herewith.

### EN OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

### # # #   END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW   # # #